No. 2628.

## Joe N. Blain v. The State.

1. PRACTICE—EVIDENCE.—It is an established and statutory rule of evidence in this State that "persons charged as principals, accomplices or accessaries, whether in the same indictment or in different indictments, can not be introduced as witnesses for each other." Under this rule the declarations of a principal co-defendant were, in this case, properly excluded, they being no part of the res gestæ.
2. PRINCIPALS—CHARGE OF THE COURT.—See the statement of the case for a charge of the court upon the doctrine of principals in crime *held* correct.
3. THEFT—FACT CASE.—See the statement of the case for evidence *held* sufficient to support a conviction for theft.

APPEAL from the District Court of Gonzales. Tried below before the Hon. George McCormick.

The conviction in this case was for the theft of five head of

·cattle, the property of John Jobe, in Gonzales county, Texas, on the sixteenth day of April, 1887. G. C. Barber was jointly charged in the indictment, but the defendant was alone upon trial. A term of two years in the penitentiary was the penalty .assessed against him.

John Jobe was the first witness for the State. He testified that he lived in the town of Gonzales, Texas. He owned a pasture across the Guadalupe river from said town and about two .and a half miles distant from it. Some time in the spring of 1887 he missed several head of red roan cattle from his said pasture. They were branded JOB on the left hip. Tom Terry was in charge of the pasture fence, and attended to the branding of witness's cattle. The animals missed by witness were two year olds. The animals he sold Barber were "long twos," except one, which was a three year old. On his cross examination the witness said that his pasture contained between a thousand and twelve hundred acres of land. He should have about two hundred and fifty head of cattle, counting all grades, in that pasture. In March, 1886, the witness sold twelve head of cattle to G. C. Barber, eleven of them being two year olds and one a three year old. Some of them were red and some were spotted, but none, as well as witness could remember, were roan. At the time that he bought the twelve head of cattle, Barber put them in the 7 brand. It was understood at the time the twelve animals were sold to Barber that he was to feed and ship them. The witness would not have sold the cattle without that understanding. He had often refused to sell cattle in his brand to be kept in the country. The witness would not swear that the cattle he missed from his pasture were stolen, but he had never seen them since they disappeared from his pasture. The witness never saw the cattle found in Houston's pasture, of which pasture defendant had charge.

Tom Terry was the next witness for the State. He testified that for four years he had been in the employ of John Jobe, keeping up his pasture fence, and branding his cattle. About April 1, 1887, the witness missed some cattle from Jobe's pastures. Some of the animals missed were of a red color, and some were roan. Late in April, witness went to the Murray pasture, about twenty-five miles from Jobe's pasture to get a steer. In the Murray pasture he found two of Jobe's roan two year old animals, both being branded JOB. Witness knew those animals well, having milked their mothers, and he knew

that they were not of the twelve animals sold by Jobe to Barber. The two Jobe cattle were fresh branded on the ribs, the fresh brands being, as well as witness could remember, the letters OL. The two animals were with the four year old steer which Barber bought from Jobe as a three year old in 1886. On his cross examination the witness stated that he was not present when the animals sold by Jobe to Barber were delivered to the latter.

W. E. Jones, sheriff of Gonzales county, testified, for the State, that, in April, 1887, a search warrant was placed in this hands directing him to search several pastures, among them the one known as Murray's, for cattle in the JOB brand, belonging to John Jobe. Defendant had charge of the Murray pasture. Witness reached that pasture early on one Saturday morning, late in April, and met the defendant in the pasture. Witness explained his business to defendant, and defendant in reply said that he had but one JOB animal in the pasture, which, he said, he got from Barber. He said nothing about having purchased a number of JOB cattle from Barber. He simply referred to the four year old steer in the JOB brand. Witness searched the pasture until eleven o'clock without finding a single animal in the JOB brand. The pasture contained about one thousand acres, and was searched carefully by witness and his ten or twelve assistants. After searching the pasture witness started his men off to arrest certain parties, and, with John Jobe, rode himself back to Gonzales. The Murray pasture was in Gonzales county. A lane separated it from the Houston pasture, which was across the line in Karnes and Wilson counties.

W. F. Campbell testified, for the State, that he was a constable of Gonzales county, and acted as deputy sheriff under Sheriff Jones. Late in April, 1887, Sheriff Jones directed witness to meet him with some men at the Murray pasture, for the purpose of searching it. Witness went with a posse of men to that pasture on Friday evening, and camped that night in the pasture. On the next morning John Jobe and Sheriff Jones arrived, and Jobe described two animals for which he wanted search made. He described them as two speckled roan two year old steers, branded JOB on the hip. The search was made but no JOB cattle were found. The pasture contained a number of cattle branded OLO on the side. After the search was completed Sheriff Jones despatched the witness and the other men to a point about eight miles distant, to arrest a negro. In passing

through a lane which separated the Murray pasture from other pastures, which point was on one side of J. D. Houston's pasture, the witness and his party found a bunch of six or seven head of cattle. That point was between four and five miles distant from Murray's pasture. Of the cattle mentioned, two were speckled roan two year olds, branded JOB, corresponding with the description of the animals given by Jobe. Two were red two year olds, branded JOB. One was a large four year old steer, branded JOB, and another was a yellow or brown steer. The two year old steers were branded, besides the JOB brand, in the OLO brand. Christie McCoy, L. S. McCoy and John Bishop were with witness when he found the cattle. Having looked at the cattle, the witness and his party went into the Knowles pasture, near by, to "noon it." When they finished their noon they returned to the lane, but meanwhile the cattle had moved. The party then moved up the lane about three quarters of a mile, where they again found the same animals. About that time the defendant rode up from the inside of the Houston pasture, and asked witness if he had found any thing that he wanted, to which question the witness made no reply. He asked it again, and witness replied: "I will tell you later." The defendant left at once, and witness and his party drove on towards Rancho, sending L. S. McCoy to overtake Sheriff Jones and Jobe. Before the party reached the place in Houston's pasture where defendant lived, the defendant and James King came down the lane, both armed with pistols, and overtook the party. As they rode up, defendant asked witness what he proposed to do with the cattle. Witness replied that he did not yet know, but that he had sent for Jones and Jobe to identify the cattle. Defendant replied that the cattle belonged to him, and that, "by God," witness should not drive them away. Defendant talked in a hostile manner for a while, but quieted down after witness gave him to understand that he and his party were going to hold the cattle until the arrival of Jobe. Witness then drove the cattle to the J. D. Houston pens, near which the defendant lived. About that time he learned that Jones and Jobe had returned to Gonzales. Defendant then told witness that he had purchased the cattle from Clarke Barber, and proposed, if witness would leave them at the pen, he would provide grass, grub and water for them, and witness left the cattle in the pen. Witness and his party returned to the pen for the cattle on the following Tuesday, but did not find them. They saw defendant, who told

them that he had turned the cattle out. The witness and his party then searched the pasture for three or four hours, but, finding only the four year old steer. they abandoned the search. The point at which the cattle were first found was in a lane, on one side of which there was a pasture (not the Houston or Murray pasture), in the fence of which there were many gaps, through which cattle came and went. That pasture also had gates at the lower end, and was in Karnes county. The OLO brand on the cattle appeared to be about three or four weeks old. When witness called for the cattle on Tuesday, and asked defendant where they were, he said that they were some where in the pasture, but did not proffer to help hunt for them. Witness was positive that all of the animals found by him and his party in the lane, save two, were two year olds. The Houston pasture was a large one, but witness did not know how many acres it contained. It was in Wilson county. Defendant was in the Murray pasture when that pasture was searched for the cattle. Witness did not see the 7 brand on any of the animals except the four year old steer.

Christie McCoy testified, for the State, substantially as did the witness Campbell, and in addition said that he was a stock man of thirty or forty years experience, and could not be mistaken as to the age of the cattle found in the lane. At least five of them were year olds. While driving the cattle down the lane, the defendant said that he and G. C. Barber were partners in the OLO brand, and that the cattle were partnership property. Witness was not certain, but thought that the 7 brand was on all of the cattle.

John Bishop testified, for the State, substantially as did the witnesses Campbell and Christie McCoy, and in addition that, several days after the last search of the pasture for the cattle found in the lane and left in the Houston pen, the witness, R. M. Glover, Ed. Bundick, Al and Leslie Beasley and Charley Ellis made a final search of the Murray and Houston pastures for the cattle, and found two of the animals dead in the Houston pasture. One of them was a speckled roan, and the other was a red. They lay on their right sides, about two hundred yards apart, one with a bullet hole behind the shoulder, and the other with a bullet hole through the neck. Each of those animals was two years old. Each was branded JOB—the old brand—and OLO, a recent brand. Witness recognized them at once as two of the same animals found in the lane by Campbell and his party, and

left in defendant's pen a few days before. Witness did not see the 7 brand on those animals, but he did not turn the bodies over. The bodies lay in a hollow and witness observed that the ears exposed to view had been cut off. Some time subsequent to the discovery of the dead bodies of the animals in the pasture, the witness was in Nixon's store in Rancho, when he saw the defendant pass by with a small bunch of cattle. He rode up to the store and asked witness how long he would be in town. Witness replied that he would not be there long. Defendant than said that he wanted to have a talk with witness, and asked him to wait until he had disposed of his cattle. He came back presently and asked witness to go to the back of Nixon's store with him. Witness did so. He then remarked that there had been a great deal of talk about this transaction floating around, and that witness and Dick Glover were the only parties connected with it who had given him a fair deal; that he wanted witness to understand that he had no ill feeling against witness, but was his friend. He then said: "I acknowledge to running the cattle out of the pasture because I did not want Captain Jones to get them." He then asked: "John, don't you think you can be mistaken about the cattle you found dead in the pasture being two of the cattle you found in the lane?" Witness replied: "No; they were two of the same cattle." Defendant replied: "I will not dispute your word, but I will show up the cattle." In the same connection he said that the OLO brand was his, and that he and Barber were partners. Witness did not hear defendant tell Campbell, when the cattle found in the lane were left at the pen, that he would furnish grass, grub and water for them. Defendant did not tell witness that he bought the cattle from Barber, nor did he say how he got them.

Ed. Bundick testified, for the State, that about May 1, 1887, he was called upon by Deputy Sheriff R. M. Glover to assist in searching a pasture for JOB cattle. Witness, Al and Leslie Beasley, Charley Ellis, John Bishop, R. M. Glover and Jap Glover went into the Houston pasture and searched it. They found the dead bodies of two two year old steers, one a speckled roan in color, and the other a red. They were branded JOB on the left hip, and OLO on the side, and their ears had been cut off. Each of these animals had been shot from a forty-five calibre pistol. Witness did not see the 7 brand on either of them. Al Beasley and Charley Ellis testified, for the State, substantially as did the witness Bundick.

Sol Brown testified, for the State, that he was a resident of Karnes county, and was brought to this court under attachment as a witness for the defense. Late in April or early in May, 1887, the witness and M. C. Patton went from witness's place in Karnes county to the M. G. Knowles pasture, in Wilson county. They traveled through the lane mentioned in the testimony of the previous witness. At a point in that lane, on the day that Campbell and his party were said to have found some cattle, the witness and his party passed seven head of cattle, standing in a shade. Five of the animals were two year old steers, branded JOB on the left hip and OLO on the side. The latter brand appeared to be several weeks old. Two of the two year old steers were speckled roan in color, two were red, one was spotted, one was a four year old red steer, and the remaining one was a three year old brown steer. About the same time witness saw Campbell and his party at a well in the lane.

It was next proved, by the State, that the recorded brand of G. C. Barber was the figure 7, and the OLO brand was not of record in Gonzales county. It was also proved that JOB on left hip was the recorded brand of John Jobe, and that Jobe's mark was a crop off the right ear.

The State rested.

John Blain, the defendant's brother, testified, in his behalf, that in March, 1887, he sold the defendant twenty-seven head of mixed cattle, and on the nineteenth day of March the witness started those cattle from his place, on the east side of the Guadalupe river, to the defendant's pasture near Rancho, about thirty miles from Gonzales. Witness drove the cattle on the first day to G. C. Barber's pasture, where Barber put about the same number of cattle with the bunch which witness was driving. Among the cattle put into the herd by Barber were six three year old cattle branded JOB. Milton Fly, George Nelley and Hiram Stevenson were present at the time. The parties named then drove the cattle to Tom Stevenson's pasture, where they were kept over night. On the next morning, March 20, 1887, the cattle were driven to defendant's pasture, put in the pen, and all save a few very poor ones were sold by witness to defendant, and turned into the pasture. When Barber put the cattle he had with those witness had, he said that he had sold them to defendant. Of the JOB steers put into the herd by Barber, two of them were speckled roan in color and several were red. The witness was digging a tank in the Murray pasture when Sheriff Jones

and his men came and searched that pasture. On that same evening the witness saw some cattle in defendant's pen which were branded JOB and OLO. They were some of the cattle driven by witness, Barber and Nelley to that pasture in March. Defendant was not present when the cattle were started from Barber's to his pasture, but was then at home in Wilson county. The witness was not now living on the defendant's place. He went there with cattle on March 20, 1887, and remained there until about the middle of April, when he left with cattle which he delivered to Mabry, and has since lived at his own home. He had not visited defendant's pasture but two or three times since the middle of April, 1887. The cattle sold to Mabry were delivered to him just across the river from Gonzales a few days before the sheriff and his posse searched the Murray pasture. Since then, the witness had branded calves in the Houston pasture, of which defendant had charge. The JOB cattle driven by witness, Barber and Nelley to defendant's pasture were all three year old steers. Witness did not, during the search of the Murray pasture, tell John Bishop that the pasture contained but one JOB animal, and that it was a four year old steer. Witness did not see Campbell and his posse put the cattle in defendant's pen, but saw some JOB cattle in that pen that night. Witness did not know what had become of the six JOB steers he took to defendant's place.

George Nelley testified, for the defense, that he lived near Stockdale, in Wilson county, but had been working in the J. D. Houston pasture, of which the defendant had charge. In March, 1887, the witness went from defendant's place to John Blain's, and helped John drive some cattle to the defendant's pasture. They took the cattle the first day to Barber's pasture, where Barber put into the herd about twenty-five head more, six three year old JOB steers being among the number; all of which Barber said he had sold to the defendant. Of the six JOB steers two were speckled roan and several were red in color. Those cattle were penned the first night at Tom Stevenson's pasture. They were driven to defendant's pens on the next morning, branded OLO and turned into the pasture. Witness was at the tank in Murray's pasture when Jones and his posse came there to search it, which was on Saturday. From the tank witness went to defendant's house, and thence rode with defendant to the pasture gate, where he was arrested for carrying a pistol, and was taken to Gonzales and placed in jail. Witness did not

see the cattle that were put in the pen by Campbell and McCoy on that night, as he was taken to town in arrest by Jones. Since his release the witness has been working for the defendant, gathering cattle in the Houston pasture and putting them in the Murray pasture. He had never seen but three of the six JOB cattle since the pasture was searched. Those three he put into the Murray pasture. He did not know where the other three were, and had never seen any of them dead.

James King testified, for the defense, that he was at the defendant's house sick when John Blain, Nelley and Barber brought a bunch of cattle to that place. That was in March, 1887. He took some water to the pen for the men while they were there, and saw the cattle. Six of those cattle were three year old steers, branded JOB. Those cattle were placed in the OLO brand. There were two pastures known as the Houston pastures. One of them contained about twenty thousand acres, and the other about three thousand. The large pasture was heavily overgrown with brush, and a hundred men, hunting a week, could not find and gather all the cattle in it. Witness had worked for the defendant about three years, and had always been paid by the defendant in person. Witness's principal business was to look after defendant's stock, but he helped with the Houston stock. He was with defendant when defendant, on the day of the search, went down the lane and overtook Mr. Campbell, McCoy, and others, with the cattle they penned that night at defendant's place. Witness did not know how those cattle came to be in the lane. Witness had been gathering cattle in the Houston pasture and putting them into the Murray pasture, which the defendant and Barber told witness they had bought from Murray. Witness put four of the six JOB steers into the Murray pasture. Defendant and Barber told witness that they were partners in the OLO brand. Witness did not know how many cattle there were in the OLO brand, but there were more than a hundred. Witness did not know that the JOB cattle found by Campbell and McCoy in the lane were the same animals which Barber sold to defendant, because he was not present when Barber's delivery to defendant was made, but they were the same animals witness saw in defendant's pen when he took the water to John Blain, Nelley and Barber when they arrived. Witness knew nothing about two dead steers being found in the pasture.

Milton Fly testified, for the defense, that he was a butcher

and lived in Gonzales. One Sunday evening, late in March, 1887, he went to Barber's pasture to get some beeves. While there John Blain and Nelley arrived with a bunch of cattle, to which Barber added others, including five or six three year old steers, branded JOB. Barber said that he had sold the animals to defendant. Two or three of the JOB animals were fat, and witness proposed to buy them for beef. Barber refused to sell them unless witness would take all in the JOB brand, which witness declined to do. All the cattle were put into Stevenson's pasture for the night, and John Blain, Nelley and Barber went with witness and his cattle to Gonzales, and were in that town after supper on that night.

Hiram Stevenson testified, for the defense, that he was present in March when John Blain, Nelley and Barber gathered some cattle in Barber's pasture, and put them in a bunch brought to Barber's place by Nelley and John Blain. The bunch gathered in Barber's pasture included six three year old steers, branded JOB. Those animals were also branded 7 on the point of the shoulder. Three of them were speckled roan in color, and three were red. Those cattle were penned at witness's father's place that night, and taken off next morning. They were started to defendant's ranch about twenty-five miles distant. Witness helped drive those cattle about thirteen miles of the distance.

Milton West testified, for the defense, that he knew when Campbell, McCoy and others went out to search the defendant's pasture. After the party left Rancho, witness went to the Houston pasture. He saw John Blain at that time working on a tank in the Murray pasture, and saw the cattle in a pen about two hundred yards distant. The defendant and others who worked in the Houston pasture wore arms and had worn them ever since the fence cutting epidemic, although there had been no fence cutting since the spring of 1885. The defense closed.

John Bishop, recalled by the State, testified, in rebuttal, that on the day the Murray pasture was searched, he heard John Blain, then at work on a tank, say that there was but one JOB animal in that pasture, and that it was the four year old red steer.

The proposed testimony referred to in the first head note of this report was that offered to be made by the witnesses Jones, Killough and Hawkins, to the effect that, at the time set for the preliminary examination of this defendant, one G. C. Barber,

now indicted with defendant, but not then in arrest, came forward, and said that he sold the JOB cattle to defendant.

The charge of the court referred to in the second head note reads as follows: "All persons are principals who are guilty of acting together in the commission of an offense, when an offense has been committed by one or more persons. The true criterion for determining who are principals is, did the parties act together in the commission of the offense? Was the act done in pursuance of a common intent, and in pursuance of a previously formed design in which the minds of all united and concurred? If so, then the law is that all are alike guilty, provided the offense was actually committed during the existence and in the execution of the common design and intent of all, whether in point of fact all were actually bodily present on the ground when the offense actually took place, or not."

*Ponton & Fly*, for the appellant.

*W. L. Davidson*, Assistant Attorney General, for the State.

WILLSON, JUDGE. I. It was not error to reject the declarations of Barber with regard to the cattle. Such declarations were hearsay, and, besides, were the declarations of a co-defendant. "Persons charged as principals, accomplices or accessaries, whether in the same indictment or in different indictments, can not be introduced as witnesses for each other." (Code Crim. Proc., art. 731; Penal Code, art. 91; Helm v. The State, 20 Texas Ct. App., 41; Booth v. The State, 4 Texas Ct. App., 202; Rutter v. The State, Id., 57.) The same rule of exclusion would, of course, for an additional reason, apply to the declarations of such principal, accomplice, or accessary, unless the same constitute a part of the res gestæ.

II. We find no error in the charge of the court. Upon the subject of principals, it is in harmony with the settled doctrine established by repeated decisions of this court, and is applicable to the facts in proof. (Cook v. The State, 14 Texas Ct. App., 96; O'Neal v. The State, Id., 582; Bean v. The State, 17 Texas Ct. App., 60; Smith v. The State, 21 Texas Ct. App., 107; Watson v. The State, Id., 598, and several other decisions.)

III. In our opinion the evidence supports the conviction. Defendant's explanation of his possession of the cattle was shown to be untrue. Said explanation related to another bunch of cat-

tle which he purchased from Barber about one year prior to the theft of the cattle involved in this prosecution.

Finding no error in the conviction, the judgment is affirmed.

*Affirmed.*

[This opinion was delivered at Tyler, October 26, 1887. A motion for rehearing being filed, it was taken to Galveston under advisement, where, in an oral opinion, the motion was overruled on January 25, 1888.]